UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN HUGHEY and JESSICA HUGHEY, individually on behalf of themselves and on behalf of minor child GRAHAM HUGHEY, and GRAHAM HUGHEY,<br><br>Plaintiffs,<br><br>v.<br><br>ARTURO CAMACHO, DAN DRUMMOND, THOMAS MCDONALD, WEST SACRAMENTO POLICE DEPARTMENT, CITY OF WEST SACRAMENTO, TOD SOCKMAN, JASON WINGER, LABIN WILSON, TYLER RAINEY, ANDREA DONAHUE, CODY COULTER, CHRIS RICE, MATT BOUDINOT, RICH BENTLEY, and DOES 1–20,<br><br>Defendants. | No.  2: 13-cv-2665-TLN-AC<br><br>**MEMORANDUM AND ORDER** |

The matter is before the Court on Defendants Arturo Camacho, Dan Drummond, Thomas McDonald, West Sacramento Police Department (the "WSPD") and City of West Sacramento (the "City"),[1] Tod Sockman, Jason Winger, Labin Wilson, Tyler Rainey, Andrea Donahue, Cody

---

[1] All claims in the FAC are stated against both the WSPD and the City.  For convenience, the Court refers to a single public entity Defendant, the City, with the understanding that the WSPD is a division of the City.  Per Cal. Gov. Code § 815.2, "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.  (b) Except as otherwise provided by statute,

1

Coulter, Chris Rice, Matt Boudinot, and Rich Bentley's (collectively "Defendants") Motion to Dismiss the First Amended Complaint ("FAC") brought by Plaintiffs Kevin Hughey ("Mr. Hughey"), Jessica ("Mrs. Hughey") and Graham Hughey (collectively "Plaintiffs"). For the reasons discussed below, the Motion to Dismiss is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

### Factual Allegations

This case derives in part from the facts alleged in a different lawsuit pending before this Court, *Hughey v. Drummond et al.,* 2:14–cv–37–TLN (complaint filed on January 7, 2014). In that case, Plaintiffs (Mr. and Mrs. Hughey) alleged that Mr. Hughey was the victim of an unprovoked police shooting on July 9, 2012, by an officer against whom an excessive force finding was made by the WSPD. Plaintiffs alleged that Defendants in that case (officers and others associated with the West Sacramento Police Department) conspired to fabricate evidence and to conceal the unlawfulness of the shooting.

In the instant FAC, in summary the factual allegations are as follows.[2] On November 9, 2013, at about 8:50 PM, Mr. Hughey slipped and fell down the stairs in his home. Following the fall, Mrs. Hughey observed Mr. Hughey sitting awkwardly and without any clothes on at the base of the stairs. He was disoriented and bleeding profusely from his head. At about 8:54 PM, Mrs. Hughey called 9–1–1, reported the accident, and requested that paramedics be dispatched to her home. The 9–1–1 operator stayed on the phone with Mrs. Hughey until the paramedics arrived about 5 minutes later. At that point, the operator informed Mrs. Hughey that the paramedics were in the rear alley and she should open the door to let them in. Mrs. Hughey hung up the phone and let the paramedics into her home through the rear garage entrance. (FAC ¶¶ 14–19.)

Mr. Hughey declined medical treatment from the paramedics and asked that they leave. The paramedics left through the rear garage entrance and reported to the 9–1–1 operator that Mr.

---

a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

[2] The Court summarizes the instant allegations here, and refers to more specific allegations as necessary for individual claims, below.

Hughey was an uncooperative patient. Defendant Officer Sergeant Camacho then advised dispatch that an officer-involved shooting had occurred at this location (the July 9, 2012 shooting that is the subject of case 2:14–cv–37). Camacho "was present at Mr. Hughey's house on July 9, 2012, during the aftermath of WSPD's wrongful shooting and during the fabrication of evidence against Mr. Hughey. Sergeant Camacho knew or should have known that the 'officer involved shooting' on July 9, 2012 was a result of WSPD wrongdoing," and intentionally withheld that information. (FAC ¶¶ 19–21.)

The WSPD then dispatched eight armed officers (Defendants Camacho, Winger, Wilson, Rainey, Donahue, Coulter, Rice, and Boudinot) to Plaintiffs' residence. Initially, officers were informed that Plaintiffs were hostile and had aggressive dogs, but they were subsequently told by the paramedics (apparently upon the officers' arrival at the residence) that Mr. Hughey was not physically combative and that he had only been aggressive in asking the paramedics to leave. The WSPD also performed a check for criminal conduct on Mr. Hughey, and discovered no criminal convictions associated with Mr. Hughey or the residence. (FAC ¶¶ 22–23.)

Defendant Camacho "intentionally disregarded the results of the background check" and directed the operator to contact Mrs. Hughey. At approximately 9:12 PM, the 9–1–1 operator called Mrs. Hughey and asked if she would be willing to come outside to talk to one of the officers. Mrs. Hughey was hesitant because of the shooting that had occurred on July 9, 2012. The operator persisted, and eventually Mrs. Hughey opened her front door while holding her infant son, Graham Hughey. At that point, the officers shined their flashlights in her eyes and requested that she step outside. Some of the officers had tasers and guns drawn. Mrs. Hughey was escorted away from her front door. The officers shouted at Mrs. Hughey, asking if there were weapons in the home, and she responded that there were no weapons. Mrs. Hughey asked if she could return home to tend to her injured husband. The officers responded that she could not. Mrs. Hughey attempted to return inside and the officers prevented her from doing so. One of the officers informed her that they were present to protect the paramedics, although the paramedics were in the rear alley at the time. (FAC ¶¶ 23–31.)

At approximately 9:15 PM, Mr. Hughey came outside wearing only a pair of shorts. The

officers raised their guns and tasers and surrounded him.  Mrs. Hughey then rushed in between the officers and Mr. Hughey, and shouted at Mr. Hughey that he should return inside for his safety.  Mrs. Hughey returned inside and attempted to pull her husband in by the arm but he remained outside.  Eventually, Mrs. Hughey opened the rear garage door to seek assistance from the paramedics, observed two WSPD officers standing there, and requested that the paramedics proceed to the front of the home to assist Mr. Hughey.  The paramedics attempted to proceed around the house to contact Mr. Hughey but WSPD officers prevented them from doing so.  Mrs. Hughey grabbed Mr. Hughey and pushed him into the house. A few minutes later, all WSPD officers left.  (FAC ¶¶ 31–49.)

At some point during the encounter, Mr. Hughey was classified by WSPD either as requiring unconsenting medical aid or as having a mental disorder that would permit WSPD to seize and confine him without consent.  WSPD also initiated a DMV query on the family vehicle.  (FAC ¶¶ 41, 42.)

Mr. Hughey eventually went to UC Davis Medical Center and was diagnosed with a fractured left elbow that required surgery, a fractured wrist, a broken nose, a concussion, cracked ribs, and several contusions.  (FAC ¶ 62.)

Defendant Wilson later provided a written statement of the events. That statement did not include details of the threats the officers made to Plaintiffs during the encounter, or details that would evidence the lack of a need for the level of force used by the officers.  The officers did not activate their audio devices during the encounter.  (FAC ¶ 50.)

Plaintiffs allege that Defendants did not comply with various WSPD policies.  For example, according to Plaintiffs, WSPD Policy 300.3 "requires in part that officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose." (FAC ¶ 56.)  WSPD policy 300.5 "provides that any use of force by a member of [the WSPD] shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the accident." (ECF No. 29 ¶ 60.)  WSPD policy 446.3 "requires that going into service, each officer will properly equip him/herself to record audio and video in the

4

field," and policy 450.5 "requires the activation of the audio recording device."  (ECF NO. 29 ¶ 51.)[3]

As to the individual Defendants, according to Plaintiffs' moving papers: Drummond is the former chief of police for the WSPD.  McDonald is the current chief of police for the WSPD.  Bentley and Sockman are WSPD officers and exercised some supervisory role over the officers who responded on the night of November 9, 2013.  Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho were the eight responding officers on the night of November 9, 2013 (hereinafter referred to as the "eight responding officers").

**Causes of Action**

Plaintiffs bring the following causes of action in the FAC:

1. Assault against the City and the eight responding officers.
2. Negligence against all Defendants.
3. Intentional Infliction of Emotional Distress against the City and the eight responding officers.
4. Negligent Infliction of Emotional Distress against the City and the eight responding officers.
5. Intrusion (Invasion of Privacy) against the City and the eight responding officers.
6. False Imprisonment against the City and the eight responding officers.
7. Trespass to Land against the City and the eight responding officers.
8. Negligent Supervision against the City, Drummond, McDonald, Bentley, and Sockman.
9. Negligent Entrustment against the City, Drummond, McDonald, Bentley, and Sockman.
10. RICO violations, 18 U.S.C. § 1961 *et seq*. against all Defendants.
11. Violations of 42 U.S.C. § 1983 against all Defendants.

**Procedural History**

The original complaint was filed on December 30, 2013.  (ECF No. 1.)  The Court granted

---

[3] The quoted portions are the policies as stated by Plaintiffs in the FAC, which Defendants have not opposed.

5

in part and denied in part Defendants' motion to dismiss that complaint on October 23, 2014. (ECF No. 28.) The FAC was filed on November 6, 2014, and the instant motion to dismiss was filed on December 1, 2014. (ECF Nos. 29, 30.) Plaintiffs filed an opposition and Defendants filed a reply. (ECF Nos. 33 & 35.) The matter was submitted without oral argument on January 9, 2015. (ECF No. 34.)

## ANALYSIS

### Claim One: Assault

Claim One is brought against the City and the eight responding officers. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Cal. Pen. Code § 240. *See* 5 Witkin, Summary of California Law, 10th Edition (2005) Torts, § 381 ("In tort actions for assault and battery, the courts usually assume that these Penal Code definitions and related criminal cases are applicable.")

Defendants argue that Plaintiffs have not complied with the Court's prior Order regarding "shotgun pleading." That Order stated that Plaintiffs were to designate the specific facts that underlie each claim, and that Plaintiffs should specify which Defendants were invoked for each claim. (ECF No. 28 at 10.) In the FAC, Plaintiffs did comply with the previous Order insofar as they named specific Defendants. Defendants do not state an additional argument in support of dismissing this cause of action.

This claim is based on the majority of said 62 paragraphs of facts. The facts underlying this claim are the collective actions taken by the eight responding officers during the altercation, some of whom had guns and tasers drawn and pointed at Mr. and Mrs. Hughey. For the purposes of this motion to dismiss, Plaintiffs are not required to know which of the eight officers performed every act throughout the altercation (for example, specifically which officers had their firearms drawn when Mrs. Hughey left her doorway at 9:13 PM, FAC ¶ 28; which officers attempted to "cut off" Mrs. Hughey when she attempted to return inside her home, FAC ¶ 31; or which officers had their firearms raised when Mr. Hughey exited his home at 9:15 pm, FAC ¶ 33). Defendants do not dispute that the eight named responding officers were present at some point during the altercation, and that at various points some officers had their guns or tasers

drawn or pointed at Mr. Hughey or Mrs. Hughey. Plaintiffs state Mrs. Hughey called 9-1-1 to report Mr. Hughey's accident, and requested that paramedics be dispatched to her home. (FAC ¶ 14.) Plaintiffs' general position is that Mr. and Mrs. Hughey did not take threatening actions throughout the altercation which would explain this response by the officers. Therefore Defendants have received "notice of the claim such that [each] may defend himself or herself effectively. The theory of the federal rules is that once notice-giving pleadings have been served, the parties are to conduct discovery in order to learn more about the underlying facts." *Starr v. Baca*, 652 F.3d 1202, 1212 (9th Cir. 2011). *See also Wakefield v. Thompson,* 177 F.3d 1160, 1163 (9th Cir. 1999) (quoting *Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir. 1980)) ("the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the entities, or the complaint would be dismissed on other grounds").

Drawing the facts in favor of Plaintiffs, and without argument from Defendants other than their argument regarding shotgun pleading, Plaintiffs state a plausible claim for assault against the City and the eight responding officers.

**Claim Two: Negligence**

Claim Two is stated against all Defendants, based upon all 62 paragraphs in the FAC that make up the general recitation of the facts. Plaintiffs state that all "Defendants breached their duty and failed to act as a reasonably prudent person would under similar circumstances." (FAC ¶ 69.) The Court addresses separately, below, negligence against the supervising Defendants (Drummond, McDonald, Sockman, and Bentley).

As with Claim One for assault, Defendants argue that Plaintiffs have not complied with the Court's prior order stating that Plaintiffs were to designate the specific facts underlying each claim. However, as with assault, this claim is reasonably based on the majority of the facts contained in the FAC ¶¶ 1–62, which detail the collective actions taken by the eight responding officers throughout the altercation. As stated above, Plaintiffs are not required to know which of the eight officers performed every act throughout the altercation in order to state a claim.

Otherwise, Defendants do not make a separate argument supporting dismissal of Claim

Two, negligence, against the eight responding officers. The Court will not make this argument for Defendants. Drawing the facts in favor of Plaintiffs, they state a claim for negligence against the City and the eight responding officers.

### Claims Three, Four, Five, Six, and Seven: Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Intrusion (Invasion of Privacy), False Imprisonment, and Trespass to Land

Claims Three through Seven are stated against the eight responding officers, based on the full set of facts contained in the FAC ¶¶ 1–62. Apart from Defendants' reference to this Court's prior Order directing Plaintiffs to identify which facts underlie specific causes of action, Defendants do not make a separate argument in support of dismissal of these claims, and the Court will not make a separate argument for Defendants.[4]

Claims Three through Seven are based on the majority of the facts contained in the FAC ¶¶ 1–62, which detail the collective actions taken by the eight responding officers throughout the altercation. As stated above, Plaintiffs are not required to know which of the eight officers performed every act throughout the altercation in order to state a claim. Defendants do not give additional reason for dismissal, and thus do not meet their burden. Therefore, Plaintiffs state claims against the City and the eight responding officers for intentional infliction of emotional distress, negligent infliction of emotional distress, intrusion (invasion of privacy), false imprisonment, and trespass to land.

### Claims Two, Eight, and Nine: Negligence, Negligent Supervision and Negligent Entrustment

Plaintiffs bring causes of action for negligent supervision and negligent entrustment against Drummond, McDonald, Bentley, Sockman and the City. The Court also addresses here Claim Two, general negligence, stated against Drummond, McDonald, Bentley, and Sockman.

The relevant allegations include: the "individual officer Defendants [i.e. the eight responding officers] were and are unfit or incapable of adequately or competently performing the

---

[4] Defendants' Reply references false imprisonment but it is directed at Plaintiffs' constitutional claim under the Fourth and Fourteenth Amendments. (ECF No. 35 at 5.)

work for which they were hired." Drummond, McDonald, Bentley, and Sockman "knew or should have known the individual Defendants were unfit or incapable and that such unfitness or inability created a particular risk to others." The "WSPD's law enforcement personnel's unfitness/incompetence harmed Plaintiffs." The "WSPD's negligence in providing WSPD personnel with a service weapon (firearm or taser) without proper training on WSPD policies and procedures was a substantial factor in causing Plaintiffs' harm." (FAC ¶¶ 90–94.)

Plaintiffs' opposition states that the WSPD "has engaged in a high number of instances of excessive force given the small size of the police department and the population it serves. WSPD supervisors and officials were aware of the pattern and practice of its officers being improperly trained and using excessive force on several past occasions and did nothing to curb such unlawful behavior." (ECF No. 33 at 6.) The "WSPD does not enforce any of its own police procedures that pertain to a lawful arrest." (ECF No. 33 at 6.) "As an example, WSPD adopted procedures require an officer [to] activate his/her audio recording device anytime it might reasonabl[y] be perceived as necessary," but none of the officers did so on the night of November 9, 2013. (ECF No. 33 at 6.)

Specifically, Drummond and McDonald are identified by Plaintiffs as responsible for curbing excessive force cases in the WSPD, but they allegedly have not done so, as evidenced by the facts alleged in this case. Plaintiffs summarize their claims against Drummond and McDonald as: "The event that occurred on November 9, 2013 was a result of both Drummond and McDonald's failure to right the ship with regards to improperly trained, undisciplined and unsupervised subordinates within WSPD." (ECF No. 33 ¶ 9.) Plaintiffs state McDonald was hired in July, 2013, and the Court infers prior to that Drummond was Chief of Police. (ECF No. 33 at 9.)

The FAC does not appear to reference Sockman in any specific way with respect to the events of November 9.

The specific allegations made against Bentley are that he later "signed-off on Wilson's report as being acceptable even though eight law enforcement personnel failed to activate their respective audio devices." (FAC ¶ 55.) Plaintiffs further state: "[w]ith regard to [] Bentley in

particular, it is unknown how commands are distributed within WSPD, but the supervisory function is clearly broken and Bentley is in the supervisory chain. Moreover, Bentley's subsequent acquiescence despite two separate events of misconduct with the Hughey family only supports the theory that he acquiesced after the first misconduct and did nothing." (ECF No. 33 at 8.)

With respect to negligent supervision, Defendants argue that Plaintiffs have not alleged sufficient facts to meet the elements of this claim as set forth in California Civil Jury Instruction ("CACI"), No. 426 ("Negligent Hiring, Supervision, or Retention of Employee"). Those elements are: 1) that the eight responding officers were unfit or incompetent to perform the duties of a police officer; 2) Drummond, McDonald, Sockman, and Bentley knew or should have known that the eight responding officers were unfit or incompetent; 3) the eight responding officers' unfitness or incompetence harmed Plaintiffs; and 4) Drummond, McDonald, Sockman, and Bentley's negligence in supervising the eight responding officers was a substantial factor in causing Plaintiffs harm. CACI No. 426.[5] (ECF No. 30-1 at 9.) Defendants also reference *Noble v. Sears, Roebuck & Co.*, 33 Cal. App. 3d 654, 664 (1973) ("We are cited to no authority, nor have we found any authority basing liability on lack of, or on inadequate, supervision, in the absence of knowledge by the principal that the agent or servant was a person who could not be trusted to act properly without being supervised")

Defendants argue that for negligent entrustment, Plaintiffs have not alleged any facts indicating that Drummond, McDonald, Sockman, and Bentley knew that the eight responding officers were unfit or without the competence to use firearms and tasers. (ECF No. 30-1 at 9.)

Defendants also argue that liability is barred per California Gov. Code § 820.8, which provides that "except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person. Nothing in this section exonerates a

---

[5] Available at http://www.courts.ca.gov/partners/documents/caci_2015_edition.pdf. Accessed August 12, 2015. CACI No. 426 clarifies that this instruction should be given "if the plaintiff alleges that the employer of an employee who caused harm was negligent in the hiring, supervision, or retention of the employee after actual or constructive notice of the employee's unfitness." Plaintiffs allege that Defendant supervisors "knew or should have known the individual Defendants were unfit or incapable and that such unfitness or inability created a particular risk to others." (FAC ¶ 91.)

public employee from liability for injury proximately caused by his own negligent or wrongful act or omission." *See* Cal. Gov. Code § 820.8, Legislative Committee Comments – Senate, West (2015) ("This section expresses a principle contained in several sections scattered through the codes and uncodified acts that limit a public employee's liability to liability for his own negligent or wrongful conduct. The section nullifies the holdings of a few old cases that some public officers are vicariously liable for the torts of their subordinates."); *See Milton v. Nelson* 527 F.2d 1158, 1159 (1976) ("[S]upervisory personnel whose personal involvement is not alleged may not be held responsible for the acts of their subordinates under California law"); *See also Weaver By and Through Weaver v. State*, 63 Cal. App. 4th 188, 202 (1998) (on summary judgment, finding immunity proper under § 820.8 against California Highway Patrol Commissioner, based on allegations that subordinate officers injured passenger during a vehicle pursuit).

The Court agrees that Plaintiffs have not alleged non-conclusory facts showing that Drummond, McDonald, Sockman, or Bentley knew or should have known that the eight responding officers, specifically, were unfit or incompetent. Plaintiffs also do not allege non-conclusory facts indicating that Drummond, McDonald, Sockman, and Bentley knew that the eight responding officers were unfit or without the competence to use firearms and tasers. (ECF No. 30-1 at 9.) Therefore, specific claims for negligent supervision and negligent entrustment are not adequately supported and are dismissed.

Plaintiffs have identified several WSPD policies that allegedly were not complied with by the eight responding officers. In particular, Plaintiffs state that WSPD policy 446.3 "requires that going into service, each officer will properly equip him/herself to record audio and video in the field," and policy 450.5 "requires the activation of the audio recording device." (FAC ¶ 51.) Plaintiffs allege that none of the eight responding officers activated their audio recording devices; that officer Wilson was the only officer to write a report of the incident, and the report was inaccurate; and that Bentley signed off on the report despite the fact that no audio devices had been activated. For example, Plaintiffs state Wilson's report described Mr. Hughey as assuming an "attack position," which Plaintiffs allege is false. (FAC ¶¶ 50, 54, 55.) Plaintiffs argue that "[w]ith no basis existing for police presence, many minutes of interaction inspiring, a large

11

number of WSPD personnel being dispatched, extreme allegations associated with the home, ample time for activation, direct and applicable policies requiring activation, and negligible burden associated with activation, it is apparent that WSPD personnel intentionally maintained audio recording devices in the off position to cover-up unlawful conduct." Plaintiffs allege Drummond and McDonald were negligent because they did not enforce police procedures, including those regarding audio devices. (ECF No. 33 at 12.) Plaintiffs state McDonald as Chief of Police was hired in July, 2013, and the Court infers that prior to McDonald's tenure, Drummond was Chief of Police. (ECF No. 33 at 9.) It is a plausible position that officers not activating their audio devices, in contravention of a WSPD policy, contributes to instances of excessive force. Drawing the facts in favor of Plaintiffs, Drummond, McDonald, and Bentley's negligence does not necessarily rely on the acts and omissions of the eight responding officers, but involves their own failure to enforce WSPD procedures such as those regarding audio devices. Therefore, Plaintiffs state a claim for general negligence against Drummond, McDonald, and Bentley. Sockman is not mentioned in Plaintiffs' moving papers in any specific way, and thus a claim for negligence is not adequately stated against Sockman.[6]

**Claim Ten: RICO violations, 18 U.S.C. § 1961**

Plaintiffs state a claim for RICO violations against all Defendants. However, the facts pled, FAC ¶¶ 1–62, do not amount to a plausible claim under RICO, which requires Plaintiffs to establish: "(1) that an enterprise existed; (2) that the enterprise affected interstate or foreign commerce; (3) that the defendant associated with the enterprise; (4) that the defendant participated, directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendant participated in the enterprise through a pattern of racketeering activity by committing at least two racketeering (predicate) acts." *U.S. v. Darden,* 70 F.3d 1507, 1518 (8th Cir. 1995).

Plaintiffs' opposition argues that the WSPD has a history of police excessive force. Plaintiffs identify excessive force claims made against the WSPD in 2005, 2006, 2011, and the 2012 claim brought by Mr. and Mrs. Hughey in Case No. 2:14-cv-37-TLN-DAD. (ECF No. 33 at

---

[6] Defendants do not particularly address claim 2 for general negligence against Drummond, McDonald, Sockman, and Bentley, except insofar as negligent supervision and negligent entrustment are relevant.

9–12.) However, regardless of the alleged prior instances of police excessive force, the facts pled in this case do not meet the elements identified above as they specifically relate to each Defendant.

### Claim Eleven: Civil Rights Violations under 42 U.S.C. § 1983

In the FAC, Plaintiffs state a claim under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution, against all Defendants, based on the full set of facts contained in ¶¶ 1–62. Specifically, Claim Eleven references the Fourth Amendment's protection against unreasonable search and seizure; the Fourteenth Amendment's protection against deprivation of life, liberty, or property; and the Fourteenth Amendment's affordance of equal protection.

The allegations in the FAC, as to both Mr. and Mrs. Hughey at various points during the altercation, adequately state that the responding officers, by means of physical force or show of authority, in some way restrained their freedom of movement; or that Mr. and Mrs. Hughey would reasonably have believed that they were not free to leave and they in fact submitted to the responding officers' assertion of authority; or that there occurred a termination of freedom of movement through the intentional actions of the responding officers. *See Terry v. Ohio*, 392 U.S. 1, 20 n. 16 (1968); *California v. Hodari D.*, 499 U.S. 621, 628 (1991); *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 595–600 (1989). Therefore, Plaintiffs have stated a claim for unlawful seizure and use of force under the Fourth Amendment against the eight responding officers.

To the extent Plaintiffs state a seizure occurred under the Fourteenth Amendment, this claim is dismissed. *See Graham v. Connor*, 490 U.S. 386 394–95 (1989) (*"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims").

13

As to the City, "there is no respondeat superior liability under section 1983." *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir. 2002). For a municipality to be liable under § 1983, plaintiff must show "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.... [L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91 (1978). Specifically, "[i]n order to state a claim under *Monell,* a party must (1) identify the challenged policy or custom; (2) explain how the policy or custom is deficient; (3) explain how the policy or custom caused the plaintiff harm; and (4) reflect how the policy or custom amounted to deliberate indifference, i.e., show how the deficiency involved was obvious and the constitutional injury was likely to occur." *Harvey v. City of S. Lake Tahoe,* 2011 WL 3501687, at *3 (E.D. Cal. Aug.9, 2011) (citing *Young v. City of Visalia,* 687 F. Supp. 2d 1141, 1149 (E.D. Cal.2009).

Here, Plaintiffs allege that "WSPD personnel routinely and intentionally fail to engage audio recording equipment to hide their use and threats of excessive force." (FAC ¶ 55.) "Supervisors in WSPD sign off on reports as being acceptable despite personnel's failure to abide by policies that mandate the use of audio recording devices." (FAC ¶ 55.) "Sergeant Rich Bentley signed-off on Labin Wilson's report as being acceptable even though eight law enforcement personnel failed to activate their respective audio devices during a perceived extreme threat that necessitated two-thirds of the entire shift patrol being directed to the Hughey household and engaging in a verbal altercation with residents." (FAC ¶ 55.) Defendants do not dispute Plaintiffs' allegation that the eight responding officers did not activate their audio devices. The FAC (¶¶ 56–61) also contains allegations that WSPD personnel do not abide by WSPD policies regarding the use of excessive force, from which it can be inferred – it appears this is Plaintiffs' position – that a factor relevant to the use of excessive force by the WSPD is officers not activating their audio devices. Drawing all inferences in Plaintiffs' favor, they properly allege

a custom of not activating audio devices in order to avoid recording instances of excessive force, which amounts to an obvious deficiency leading to likely constitutional injuries, and which harmed Plaintiffs.  Thus, Plaintiffs state a claim against the City under 42 U.S.C. § 1983.[7]

With respect to Drummond, McDonald, Sockman, or Bentley, who are identified for their supervisory role with respect to the altercation on November 9, 2013, a "supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir. 1989) (citing *Thompkins v. Belt,* 828 F.2d 298, 303–04 (5th Cir. 1987)).  "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Id.* (quoting *Thompkins*, 828 F.2d at 304).  "The requisite causal connection can be established ... by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir. 1978).  *See Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991).  Here, the relevant allegations are those concerning Drummond's, McDonald's, and Bentley's roles in not enforcing police procedures related to

---

[7] As a reference point, Plaintiffs' allegations are similar in specificity to *Boarman* and *Mateos-Sandoval*.  *See Boarman v. Cnty. of Sacramento*, 2013 WL 1326196, at *4 (E.D. Cal. Mar. 29, 2013) (internal citations omitted) (finding *Monell* liability adequately pled on allegations that "'supervising commanders' from the County and City instructed patrol officers to detain and arrest people without probable cause if they looked subjectively suspicious. These commanders instructed patrol officers to use excessive force, including a Taser, if the person expressed anger or annoyance at being detained.  A policy of unconstitutional detentions and arrests therefore 'arose within the ranks' of patrolling officers in Rancho Cordova, and the brunt of the policy was suffered by African–Americans and other racial minorities.  The County Sheriff and City Police Chief received complaints about these activities but did nothing to stop the policy of abuse and did not discipline officers for using excessive force.  The County and City also failed to train patrolling officers in correct detention and arrest techniques, even though training was particularly needed in proper use of Tasers.")
  *See Mateos-Sandoval v. Cnty. of Sonoma*, 942 F. Supp. 2d 890, 899–900 (N.D. Cal. 2013 (finding *Monell* liability adequately pled where Plaintiffs alleged a policy of "seizing and impounding vehicles on the basis that the driver does not have a current, valid California driver's license, including when the vehicle was not presenting a hazard or a threat to public safety; keeping the vehicle [even though] someone was available to pay the impound fee to date, usually for the 30 day period specified by § 14602.6; seizing and impounding vehicles even though the driver has previously been licensed, whether in California or a foreign jurisdiction; failing and refusing to [provide] a hearing on the justification for impounding the vehicle for 30 days; failing and refusing to provide notice of the reason for impounding the vehicle for 30 days; and, on information and belief, charging an above-cost administrative fee.")

officers' use of force and officers' use of their audio devices. No officers involved in this altercation activated their audio devices and the written report filed afterwards by one of the responding officers is allegedly inaccurate. Drawing all inferences in favor of Plaintiffs, there are plausible allegations that Drummond, McDonald, and Bentley were part of the "moving force" behind the constitutional deprivations alleged in this case. Defendants have received "notice of the claim such that [each] may defend himself [] effectively." *Starr,* 652 F.3d at 1212.

Therefore, Plaintiffs state claims against the City, Drummond, McDonald, Bentley, and the eight responding officers under 42 U.S.C. § 1983.

Sockman is not mentioned in Plaintiffs' moving papers in any specific way, and thus a claim is not adequately stated against Sockman. Further, Defendants move to dismiss claims against Drummond and McDonald insofar as they are named in their official capacities, because the City is also named. "[W]hen both an officer and the local government entity are named in a lawsuit and the officer is named in official capacity only, the officer is a redundant defendant and may be dismissed." *Luke v. Abbott*, 954 F.Supp. 202, 203 (C.D.Cal.1997); *Fontana v. Alpine County*, 750 F. Supp. 2d 1148, 1154 (E.D. Cal. 2010). Plaintiffs do not oppose dismissal on these grounds. Therefore, said claims are dismissed insofar as Drummond and McDonald are named in their official capacities.

## CONCLUSION

Defendants' Motion to Dismiss (ECF NO. 30) the First Amended Complaint (ECF NO. 29) is DENIED insofar as Plaintiffs state the following claims:

- Claim One: Assault against the City, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.
- Claim Two: Negligence against the City, Drummond, McDonald, Bentley, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.
- Claim Three: Intentional Infliction of Emotional Distress against the City, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.
- Claim Four: Negligent Infliction of Emotional Distress against the City, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.

16

- Claim Five: Intrusion (Invasion of Privacy) against the City, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.
- Claim Six: False Imprisonment against the City, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.
- Claim Seven: Trespass to Land against the City, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.
- Claim Eleven: Violations of 42 U.S.C. § 1983 against City, Drummond, McDonald, Bentley, Winger, Wilson, Rainey, Donahue, Coulter, Rice, Boudinot, and Camacho.

Otherwise the Motion to Dismiss is GRANTED. Plaintiffs may file and serve an Amended Complaint within 30 days of entry of this Order. Defendants shall file a responsive pleading within 30 days of service of the Amended Complaint.

Dated: August 24, 2015

Troy L. Nunley
United States District Judge